IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| EDWARD SWITTER and PETER CONRAD, Derivatively on Behalf of WALGREENS BOOTS ALLIANCE, INC., <br><br> Plaintiffs, <br><br> v. <br><br> TIMOTHY C. WENTWORTH, STEFANO PESSINA, TRACEY D. BROWN, RICK GATES, MANMOHAN MAHAJAN, GINGER L. GRAHAM, JANICE M. BABIAK, INDERPAL S. BHANDARI, BRYAN C. HANSON, VALERIE B. JARRETT, JOHN A. LEDERER, THOMAS E. POLEN, NANCY M. SCHLICHTING, ROBERT L. HUFFINES, ROSALIND G. BREWER, JAMES KEHOE, JOHN P. DRISCOLL, JOHN STANDLEY, WILLIAM C. FOOTE, DAVID J. BRAILER, and DOMINIC P. MURPHY, <br><br> Defendants, <br><br> -and- <br><br> WALGREENS BOOTS ALLIANCE, INC., a Delaware Corporation, <br><br> Nominal Defendant. | Case No. 1:24-cv- <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br> DEMAND FOR JURY TRIAL |

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF SECURITIES LAW, BREACH OF FIDUCIARY DUTY, AND UNJUST ENRICHMENT**

Plaintiffs, by their attorneys, submit this Verified Stockholder Derivative Complaint for Violation of Securities Law, Breach of Fiduciary Duty, and Unjust Enrichment. Plaintiffs allege the following on information and belief, except as to the allegations specifically pertaining to plaintiffs which are based on personal knowledge. This Complaint is also based on the investigation of plaintiffs' counsel, which included, among other things, a review of public filings

with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by plaintiffs on behalf of nominal defendant Walgreens Boots Alliance, Inc. ("Walgreens" or the "Company") against certain of its officers and directors for breaches of fiduciary duties, unjust enrichment, and violations of law. These wrongs resulted in significant damages to Walgreens' reputation, goodwill, and standing in the business community, as well as exposing the Company to potential liability for violations of state and federal law.

2.      Walgreens owns one of the largest retail pharmacy, health, and daily living chains in the United States and Europe and operates approximately 13,000 locations.  The Company is also one of the largest purchasers of prescription drugs and other health and well-being products. Walgreens' core business segments are U.S. Retail Pharmacy, International, and U.S. Healthcare.

3.      In recent years, Walgreens attempted to expand beyond its retail pharmacy boundaries into the healthcare industry, offering services in traditional clinic settings, patients' homes, and virtual settings.  On October 14, 2021, Walgreens issued press releases announcing a $5.2 billion investment into its partnership with Village Practice Management Company, LLC ("VillageMD"), making Walgreens the majority stockholder in VillageMD.  That same day, Walgreens issued a second press release announcing the launch of its healthcare segment under the name "Walgreens Health," which was later renamed U.S. Healthcare in fiscal year 2022.  The press release revealed that the Company's VillageMD investment was a major step in accelerating its expansion into the healthcare industry.

4.      Initially, Walgreens presented VillageMD as a highly scalable business and represented that it had a management team with the right knowledge and experience to do so. However, less than two years after Walgreens' launch of its healthcare segment, the Company had already begun slowing the pace of its clinic openings due to underperformance. Unfortunately, the Company had overvalued VillageMD and continued to struggle scaling the business properly for profitability.

5.      At the same time, Walgreens was struggling with its U.S. Retail Pharmacy segment. The Company has offered pharmacy services since its formation in 1909. Walgreens' U.S. Retail Pharmacy segment continues to generate most of the Company's total revenue. The Company has continually assured the public of the segment's stable growth. However, the truth was that the Walgreens' retail stores were facing ongoing challenges within the industry, and the Company required a restructuring of its business model. In particular, Walgreens had grossly underestimated the consumer environment and faced constant pressure from issues with reimbursements and prescription volumes.

6.      Instead of promptly disclosing this material information to its investors, Walgreens continued to feed the public false assurances about the business prospects and health of its U.S. Healthcare and U.S. Retail Pharmacy segments, keeping the Company's stock artificially inflated. Between 2021 and 2022, despite knowledge of the issues, Walgreens' fiduciaries caused the Company to spend over $336.9 million to repurchase 8,348,228 shares of its common stock at inflated prices.

7.      The public would begin to discover the truth concerning the Company's challenges in rolling out its healthcare initiatives through several public disclosures revealing underwhelming performance and lowered guidance. First, on June 27, 2023, Walgreens issued a press release

detailing the financial results for the third quarter of fiscal year 2023.  The press release reported a lowered adjusted earnings per share ("EPS") guidance for the Company's fiscal year 2023 to a range of $4.00 to $4.05 per share, down from $4.45 to $4.65 per share in its previous projections. Later that day, during an earnings call, Walgreens also announced that it had begun slowing down its clinic openings.

8.      That same day, Walgreens' stock price fell over 9%, or $2.95, on June 27, 2023, to close at $28.64 per share compared to the previous trading day's closing of $31.59 per share, erasing over $2.5 billion in market capitalization in a single day.

9.      Then, on July 27, 2023, Walgreens issued a press release announcing the departure of defendant James Kehoe ("Kehoe"), as the Company's Executive Vice President and global Chief Financial Officer ("CFO").  Less than two months later, on September 1, 2023, Walgreens issued another press release revealing the sudden departure of defendant Rosalind Brewer ("Brewer") as the Company's Chief Executive Officer ("CEO") and a member of its Board of Directors (the "Board").

10.     On this news, Walgreens' stock price dropped over 7%, or $1.88, on September 1, 2023, to close at $23.43 per share compared to the previous trading day's closing of $25.31 per share, erasing over $1.6 billion in market capitalization in a single day.

11.     Although the truth behind Walgreens' business health and prospects was beginning to emerge, Walgreens' fiduciaries continued to downplay the Company's issues and provide public assurances, helping to maintain artificially inflated stock prices.  In October 2023, Walgreens' fiduciaries once again caused the Company to spend an additional $69.3 million to repurchase 3.1 million shares of its common stock at inflated prices.

12.    On January 4, 2024, Walgreens issued a press release detailing the Company's financial results for the first quarter of fiscal year 2024.  The press release reported a 43.1% year-over-year decrease in the Company's adjusted EPS.  In response to the press release, Jefferies analysts attributed the Company's poor performance to issues stemming from co-located VillageMD and Walgreens centers.

13.    In the wake of Walgreens' underperformance, the Company's stock price dropped over 5%, or $1.31, on January 4, 2024, to close at $24.26 per share compared to the previous trading day's closing of $25.57 per share, erasing over $1.1 billion in market capitalization in a single day.

14.    Finally, on June 27, 2024, Walgreens issued a press release announcing its financial results for the third quarter of fiscal year 2024.  In the press release, the Company disclosed a disappointing 36% decline in its adjusted EPS on a year-over-year basis.  Additionally, the press release revealed the Company also revised its adjusted EPS guidance to a lower range of $2.80 to $2.95 per share, down from its previous range of $3.20 to $3.35 per share.  That same day, during an earnings call, Walgreens announced plans for store closures and stated that additional closures would be considered if performance did not improve.

15.    In the wake of Walgreens' disclosure, the Company's share price plunged more than 22%, or $3.47 per share on June 27, 2024, to close at $12.19 per share compared to the previous trading day's closing of $15.66 per share, erasing over $2.9 billion in market capitalization.

16.    In sum, Walgreens' fiduciaries approved the expenditure of $406.2 million to repurchase 11,448,228 shares of its common stock at artificially inflated prices, causing the Company to overpay by more than $266.7 million.

17. Further, as a direct result of this unlawful course of conduct, Walgreens is now the subject of multiple federal securities class action lawsuits filed in the U.S. District Court for the Northern District of Illinois on behalf of investors who purchased Walgreens' shares, titled *Bhaila v. Walgreens Boots Alliance, Inc., et al.*, Case No. 1:24-cv-05907 (N.D. Ill.) and *Westchester Putnam Counties Heavy & Highway Laborers Local 60 Benefits Fund v. Walgreens Boots Alliance, Inc., et al.*, Case No. 1:24-cv-08559 (N.D. Ill.) (the "Securities Class Actions").

## JURISDICTION AND VENUE

18. This Court has jurisdiction under 28 U.S.C. §1331 because certain of the claims asserted herein arise under section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder by the SEC. The Court has supplemental jurisdiction over the remaining claims asserted herein under 28 U.S.C. §1367(a).

19. This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

20. Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) Walgreens maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Walgreens, occurred in this District; and (iv) defendants have

received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiffs**

21.    Plaintiff Edward Switter was a stockholder of Walgreens at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Walgreens stockholder.

22.    Plaintiff Peter Conrad was a stockholder of Walgreens at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Walgreens stockholder.

**Nominal Defendant**

23.    Nominal defendant Walgreens is a Delaware corporation with principal executive offices located at 108 Wilmot Road, Deerfield, Illinois.  Walgreens is one of the largest retail pharmacy, health, and daily living destinations across the U.S. and Europe with sales of $147.7 billion in fiscal 2024.  The Company has a presence in eight countries and employs approximately 312,000 people.  In addition, it is also one of the world's largest purchasers of prescription drugs and many other health and well-being products.

**Defendants**

24.    Defendant Timothy C. Wentworth ("Wentworth") has been Walgreens' CEO since October 2023, and a director since October 2023.  Defendant Wentworth is named as a defendant in the related Securities Class Actions that allege he violated sections 10(b) and 20(a) of the Exchange Act.

25.     Defendant Stefano Pessina ("Pessina") has been Walgreens' Executive Chairman since March 2021, and a director since April 2012.  Defendant Pessina also served as Executive Vice Chairman from January 2015 to March 2021, CEO from July 2015 to March 2021, and Acting CEO from January 2015 to July 2015.   Walgreens paid defendant Pessina the following compensation as an executive:

| Year | Stock Awards | All Other Compensation | Total |
|------|-------------|------------------------|-------|
| 2023 | $7,507,234 | $66,726 | $7,573,960 |
| 2022 | $7,894,869 | $111,252 | $8,006,121 |
| 2021 | - | $131,064 | $131,064 |

26.     Defendant Tracey D. Brown ("Brown") has been Walgreens' Executive Vice President and President of Walgreens Retail and Chief Customer Officer since March 2023.

27.     Defendant Rick Gates ("Gates") has been Walgreens' Chief Pharmacy Officer since March 2023.  Defendant Gates is named as a defendant in the related Securities Class Actions that allege he violated sections 10(b) and 20(a) of the Exchange Act.

28.     Defendant Manmohan Mahajan ("Mahajan") has been Walgreens' Executive Vice President and Global Chief Financial Officer since March 2024.  He was also Walgreens' Interim CFO from July 2023 to March 2024 and Global Controller and Chief Accounting Officer from July 2021 to July 2023.  Defendant Mahajan is named as a defendant in the related Securities Class Actions that allege he violated sections 10(b) and 20(a) of the Exchange Act.  Walgreens paid defendant Mahajan the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | All Other Compensation | Total |
|------|--------|-------|-------------|------------------------|-------|
| 2023 | $790,833 | $300,000 | $664,986 | $70,289 | $1,826,108 |

29.     Defendant Ginger L. Graham ("Graham") has been a Walgreens director since April 2010 and the Lead Independent Director since October 2022.  She was also a member of

Walgreens' Audit Committee from at least December 2021 to at least December 2022. Walgreens paid defendant Graham the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2023 | $166,848 | $200,000 | $366,848 |
| 2022 | $100,000 | $200,000 | $300,000 |
| 2021 | $100,000 | $200,000 | $300,000 |

30.    Defendant Janice M. Babiak ("Babiak") has been a Walgreens director since March 2021. Defendant Babiak has been Chair of Walgreens' Audit Committee since at least December 2021. Walgreens paid defendant Babiak the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2023 | $125,000 | $200,000 | $325,000 |
| 2022 | $125,000 | $200,000 | $325,000 |
| 2021 | $125,000 | $200,000 | $325,000 |

31.    Defendant Inderpal S. Bhandari ("Bhandari") has been a Walgreens director since September 2022. Defendant Bhandari has been a member of Walgreens' Audit Committee since at least December 2024. Walgreens paid defendant Bhandari the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2023 | $98,626 | $16,667 | $115,293 |

32.    Defendant Bryan C. Hanson ("Hanson") has been a Walgreens director since October 2022. Walgreens paid defendant Hanson the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Total |
|---|---|---|
| 2023 | $84,615 | $84,615 |

33.    Defendant Valerie B. Jarrett ("Jarrett") has been a Walgreens director since October 2020. Defendant Jarrett has been a member of Walgreens' Audit Committee since at least December 2021. Walgreens paid defendant Jarrett the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2023 | $100,000 | $200,000 | $300,000 |
| 2022 | $100,000 | $200,000 | $300,000 |
| 2021 | $84,066 | - | $84,066 |

34.     Defendant John A. Lederer ("Lederer") has been a Walgreens director since April 2015.  Walgreens paid defendant Lederer the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2023 | $115,000 | $200,000 | $315,000 |
| 2022 | $100,000 | $200,000 | $300,000 |
| 2021 | $100,000 | $200,000 | $300,000 |

35.     Defendant Thomas E. Polen ("Polen") has been a Walgreens director since July 2023.  Walgreens paid defendant Polen the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Total |
|---|---|---|
| 2023 | $14,130 | $14,130 |

36.     Defendant Nancy M. Schlichting ("Schlichting") has been a Walgreens director since October 2006.  Defendant Schlichting has been a member of Walgreens' Audit Committee since at least December 2021.  Walgreens paid defendant Schlichting the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2023 | $120,000 | $199,974 | $319,974 |
| 2022 | $120,000 | $199,974 | $319,974 |
| 2021 | $220,000 | $199,985 | $419,985 |

37.     Defendant Robert L. Huffines ("Huffines") has been a Walgreens director since January 2024.

38.     Defendant Brewer was Walgreens' CEO and a director from March 2021 to August 2023.  Defendant Brewer is named as a defendant in the related Securities Class Actions that allege

she violated sections 10(b) and 20(a) of the Exchange Act.  Walgreens paid defendant Brewer the

following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|-------|--------------|---------------|----------------------------------------|------------------------|-------|
| 2023 | $1,500,000 | - | $10,639,786 | - | - | $1,994,404 | $14,134,190 |
| 2022 | $1,500,000 | - | $8,511,685 | $2,885,690 | $3,570,000 | $820,114 | $17,287,489 |
| 2021 | $695,652 | $4,500,000 | $20,200,048 | - | $2,404,875 | $532,923 | $28,333,498 |

39.     Defendant Kehoe was Walgreens' Executive Vice President and Global CFO from

June 2018 to July 2023.  Defendant Kehoe is named as a defendant in the related Securities Class

Actions that allege he violated sections 10(b) and 20(a) of the Exchange Act.  Walgreens paid

defendant Kehoe the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|---------------|----------------------------------------|------------------------|-------|
| 2023 | $945,213 | $5,167,234 | - | - | $212,698 | $6,325,145 |
| 2022 | $969,202 | $3,330,666 | $1,242,103 | $1,441,689 | $128,526 | $7,112,186 |
| 2021 | $945,563 | $4,836,701 | $1,015,009 | $1,879,306 | $76,998 | $8,753,577 |

40.     Defendant John P. Driscoll ("Driscoll") was Walgreens' Executive Vice President

and President, U.S. Healthcare from October 2022 to April 2024.  Defendant Driscoll is named as

a defendant in the related Securities Class Actions that allege he violated sections 10(b) and 20(a)

of the Exchange Act.  Walgreens paid defendant Driscoll the following compensation as an

executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|------------------------|-------|
| 2023 | $902,803 | $9,546,625 | $521,076 | $47,798 | $11,018,302 |

41.     Defendant John Standley ("Standley") was Walgreens' Executive Vice President of

the Company and President from August 2020 to November 2022.  Defendant Standley is named

as a defendant in the related Securities Class Actions that allege he violated sections 10(b) and

20(a) of the Exchange Act.  Walgreens paid defendant Standley the following compensation as an

executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2022 | $1,059,592 | $2,960,576 | $1,104,095 | $1,404,632 | $137,425 | $6,666,320 |
| 2021 | $950,000 | $4,521,481 | $902,225 | $1,311,000 | $50,142 | $7,734,848 |

42.    Defendant William C. Foote ("Foote") was a Walgreens director from 1997 to

January 2023 and was also Lead Independent Director from January 2015 to October 2022.

Walgreens paid defendant Foote the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2023 | $55,833 | $200,000 | $10,000 | $265,833 |
| 2022 | $160,000 | $200,000 | - | $360,000 |
| 2021 | $160,000 | $200,000 | - | $360,000 |

43.    Defendant David J. Brailer ("Brailer") was a Walgreens director from October 2010

to August 2022.  Defendant Brailer was a member of Walgreens' Audit Committee from at least

December 2020 to December 2021.  Walgreens paid defendant Brailer the following compensation

as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2022 | $120,000 | $200,000 | $320,000 |
| 2021 | $120,000 | $200,000 | $320,000 |

44.    Defendant Dominic P. Murphy ("Murphy") was a Walgreens director from August

2012 to January 2024.  Walgreens paid defendant Murphy the following compensation as a

director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2023 | $100,000 | $200,000 | $300,000 |
| 2022 | $100,000 | $200,000 | $300,000 |
| 2021 | $100,000 | $200,000 | $300,000 |

45.     The defendants identified in ¶¶24-28, 38-41 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶24-25, 29-38, 42-44 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶29-31, 33, 36, 43 are referred to herein as the "Audit Committee Defendants."  Collectively, the defendants identified in ¶¶24-44 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

46.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Walgreens and its stockholders fiduciary obligations of care and loyalty and were and are required to use their utmost ability to control and manage Walgreens in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Walgreens and not in furtherance of their personal interest or benefit.

47.     To discharge their duties, the officers and directors of Walgreens were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Walgreens were required to, among other things:

(a)     provide truthful and accurate information regarding Walgreens' business operations and prospects;

(b)     conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(c)    remain informed as to how Walgreens conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

**Breaches of Duties**

48.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Walgreens, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

49.    The Individual Defendants breached their duty of loyalty by allowing defendants to cause, or by themselves causing, the Company to make false and misleading statements and omissions of material facts that failed to disclose, *inter alia*, that: (i) Walgreens was ill-equipped to effectively grow and expand its U.S. Healthcare segment; (ii) the Company had overvalued VillageMD and was facing difficulties in scaling it profitably; (iii) Walgreens' U.S. Retail Pharmacy segment was ill-equipped to address the ongoing challenges within the industry; (iv) Walgreens' optimistic claims of growth and stability for its U.S. Retail Pharmacy segment did not reflect its true state; and (v) the Company failed to maintain proper internal controls. The Individual Defendants also engaged in improper practices that wasted the Company's assets and caused Walgreens to incur substantial damage.

50.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of Walgreens, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the

other Individual Defendants from taking such wrongful actions. While the price of the Company's common stock was artificially inflated due to the false and misleading statements made by Individual Defendants, the Director Defendants caused the Company to repurchase millions of shares of its own common stock, despite knowledge or reckless disregard concerning the Company's true business health. As a result, and in addition to the damage the Company has already incurred, Walgreens has expended, and will continue to expend, significant sums of money.

**Additional Duties of the Audit Committee Defendants**

51.     In addition to these duties, under its Charter in effect since January 25, 2024, the Audit Committee Defendants, defendants Graham, Babiak, Bhandari, Jarrett, Schlichting, and Brailer, owed specific duties to Walgreens to assist the Board in overseeing: (i) the integrity of the Company's financial statements and its accounting and financial reporting process; (ii) the soundness of the Company's systems of internal accounting and financial controls; (iii) the annual independent audit of the Company's financial statements; (iv) the independent auditor's qualifications, performance, and independence; (v) the Company's compliance with legal and regulatory requirements; and (vi) the performance of the Company's independent auditor and internal audit function.

## <u>SUBSTANTIVE ALLEGATIONS</u>

**Walgreens Was Ill-Equipped to Face Industry Challenges**

52.     Walgreens is a Delaware corporation headquartered in Illinois. It is among the largest retail pharmacy, health, and daily living destinations across the United States and Europe. Additionally, it is also one of the largest purchasers of prescription drugs and other health and

well-being products. The Company operates through three segments: U.S. Retail Pharmacy, International, and U.S. Healthcare.

53.    Since the Company's formation in 1909, Walgreens has offered pharmacy services through its retail locations. Walgreens' U.S. Retail Pharmacy segment provides prescription drugs and a wide range of retail products. The segment comprises most of the Company's total revenue. For example, in fiscal year 2023, Walgreens reported $139.1 billion in total revenue, with its U.S. Retail Pharmacy segment generating approximately $110.3 billion.

54.    However, Walgreens decided to expand beyond its retail pharmacy boundaries and move into the healthcare services industry. Walgreens' U.S. Healthcare segment was a relatively recent addition to the Company's offerings, representing an ambitious attempt to capitalize on the U.S. healthcare system. On October 14, 2021, Walgreens issued a press release announcing a $5.2 billion investment into its partnership with VillageMD. VillageMD provides a nationwide network of value-based primary care, multispecialty care, and urgent care services, aligning with the Company's vision for an integrated primary care and pharmacy model. Walgreens' investment increased its ownership stake from 30% to 63%, giving the Company a majority stake in VillageMD.

55.    That same day, in a second press release, Walgreens launched its healthcare segment. The press release revealed the Company's investment in VillageMD as a major step in its plans to accelerate its expansion into the healthcare market.

56.    Unfortunately, the Company's growth initiatives did not execute as planned. Despite the Company's confidence in the partnership, Walgreens was unable to successfully scale VillageMD, which forced the Company to reduce its stake and relinquish its position as a majority owner in just a few years.

57.     At the same time, the Company's retail stores were struggling within the industry. Walgreens had grossly underestimated the consumer environment and could no longer sustain any meaningful growth.  As a result, the Company failed to meet its own guidance figures and resorted to store closures and reduced operating hours.

58.     Instead of alerting investors to the Company's ongoing issues, the Individual Defendants made a series of false and misleading statements that conveyed confidence in Walgreens' ability to effectively manage the hurdles within the industry, thereby keeping the Company's stock price at inflated levels.  Despite awareness of these ongoing issues, the Director Defendants approved several repurchases of its common stock at inflated prices, causing the Company to overpay by more than $266.7 million.

**Despite Ongoing Challenges with the Rollout of Its U.S. Healthcare Segment, Walgreens Misled the Public with False Assurances Concerning Its Growth and Performance**

59.     In Walgreens' second press release issued on October 14, 2021, defendant Brewer provided assurances about the Company's capabilities and expertise to scale VillageMD and expanding its healthcare initiative towards sustainable growth.  In particular, defendant Brewer stated: "Our strategy leverages an ecosystem including our trusted brands, exceptional assets, healthcare expertise and scale, integrated with a range of new talent, capabilities, resources and an intensified focus on operational excellence to drive long-term sustainable profit growth."

60.     The press release also included optimistic growth projections for its U.S. Healthcare segment.  In particular, the press release stated:

> Over the next three years, the company expects annual adjusted earnings per share (EPS) core growth of around four percent, with flat growth in fiscal 2022 and acceleration each year thereafter, as Walgreens Health generates increasing returns.
>
> Beyond fiscal 2024, the company's long-term growth algorithm leads to adjusted EPS growth of 11 to 13 percent, as the faster growing and higher margin Walgreens Health achieves scale.

61.    That same day, Walgreens held an earnings call with analysts and investors to discuss its fiscal fourth quarter and full year 2021 financial results.  During the call, defendant Brewer gave assurances about the Company's ability to effectively incorporate VillageMD into its healthcare strategy.  In particular, defendant Brewer stated:

> While we already have a fantastic partnership with VillageMD, our ownership stake gives us a greater opportunity to expand and accelerate while further coordinating our assets to drive better outcomes.  ***We already know how to work with VillageMD. We know how to scale their model.***  We built co-located clinics at many Walgreens locations and have continued to learn while we did.

62.    On January 6, 2022, Walgreens issued a press release announcing its financial results for the fiscal first quarter of 2022 ended November 30, 2021.  The press release quoted defendant Brewer boasting about the Company's performance across all segments and highlighted its long-term prospects for the healthcare initiative.   In particular, defendant Brewer stated:

> ***I am particularly excited about the progress we're making in building out Walgreens Health.***  Our majority investments in VillageMD and Shields closed during the quarter, and we're rolling out VillageMD primary care co-locations and Walgreens Health Corners at pace.  The strong start to the fiscal year reinforces our confidence in the future, and as a result, ***we are raising our guidance for the full year and increasing investments in our people.  Looking ahead, we are well positioned for sustainable, long-term value creation.***

63.    On March 31, 2022, Walgreens issued a press release announcing its financial results for the fiscal second quarter ended February 28, 2022.  In the press release, defendant Brewer reported optimistic projections for VillageMD sales and continued to express confidence in the growth of the Company's healthcare initiative.  In particular, defendant Brewer stated, "VillageMD and Shields are delivering ***tremendous pro forma sales growth compared to their year-ago standalone results, and our Walgreens Health segment is on track toward long-term targets.***  The strategic review of our Boots business is progressing, and our transformational actions are accelerating sustainable value creation."

64.    On October 13, 2022, Walgreens issued a press release announcing its financial results for the fiscal fourth quarter and full year ended August 31, 2022.  The press release quoted defendant Brewer praising the growth of the Company's U.S. Healthcare segment and providing assurances about its long-term outlook.  In particular, defendant Brewer stated:

> **WBA has delivered ahead of expectations in the first year of our transformation to a consumer-centric healthcare company.**  Our resilient business achieved growth while navigating macroeconomic headwinds.  Fiscal 2023 will be a year of accelerating core growth and rapidly scaling our U.S. Healthcare business.  **Our execution to date provides us visibility and confidence to increase the long-term outlook for our next growth engine** and reconfirm our path to low-teens adjusted EPS growth.  Our strategic actions are unlocking sustainable shareholder value as we simplify the company and continue our journey to being a healthcare leader.

65.    The press release also reported that the Company raised its fiscal year 2025 sales target for the U.S. Healthcare segment to between $11 billion and $12 billion, up from $9 billion to $10 billion.  It was also noted that the Company projected the segment would achieve positive adjusted earnings before interest, taxes, depreciation, and amortization ("EBITDA") by fiscal year 2024.

66.    On November 7, 2022, Walgreens issued a press release announcing VillageMD's acquisition of Summit Health-CityMD.  The press release demonstrated the Company's utmost confidence in its U.S. Healthcare segment, revealing significant adjustments to its guidance figures.  In particular, the press release stated:

> WBA is raising its U.S. Healthcare fiscal year 2025 sales goal to $14.5 billion to $16.0 billion, from $11.0 billion to $12.0 billion previously.  WBA's U.S. Healthcare segment is now expected to achieve positive adjusted EBITDA by the end of fiscal year 2023.  Assuming a Jan. 1, 2023 closing date, WBA is raising the U.S. Healthcare adjusted EBITDA target for fiscal year 2023 to $(50) million to $25 million, from $(240) million to $(220) million previously.

67.    The statements referenced above were each false and misleading when made because they failed to disclose that: (i) Walgreens was ill-equipped to effectively grow and expand

its U.S. Healthcare segment; and (ii) Walgreens had overvalued VillageMD and was facing difficulties in scaling it profitably.

**Even as the Truth Begins to Emerge, Defendants Continue to Mislead the Public**

68.     The truth behind Walgreens' business prospects and the Individual Defendants' wrongdoing began to emerge on June 27, 2023, with the Company's press release announcing its financial results for the fiscal third quarter ended May 31, 2023.  The press release revealed signs of Walgreens' difficulties with its business transition into healthcare, reporting that it had fallen short of analysts' expectations.  In response, the Company lowered its EPS guidance for fiscal year 2023 to a range of $4.00 to $4.05 per share, down from $4.45 to $4.65 per share in its previous forecast.  However, the press release contained assurances that Walgreens was taking "immediate actions to drive sustainable growth."

69.     That same day, Walgreens held an earnings call with analysts and investors to address the Company's disappointing fiscal third quarter 2023 financial results.  During the call, defendant Driscoll noted that the Company had also begun slowing down its clinic openings.  However, he counterbalanced the negative news by commending VillageMD's performance and reaffirming the Company's focus to its growth.  In particular, defendant Driscoll stated:

> ***Over the last few months, we've slowed the pace of clinic openings in new markets.*** As we've studied their performance, ***we have refocused our growth plans to leverage regional density to support more profitable growth.***  To achieve our strategic objectives of better engagement and lower cost of care in a more cost-effective manner, we are launching new virtual and asset-lite models.  We've expanded our marketing efforts to support patient panel growth in our clinics and are working with new leadership to accelerate cost control.  ***We continue to be impressed by the performance of our more mature VillageMD market's risk performance*** and are focused on continuing to accelerate the conversion of our fee-for-service lives to our proven risk-based model.

70.    On this news, Walgreens' stock price dropped over 9%, or $2.95, on June 27, 2023, to close at $28.64 per share compared to the previous trading day's closing of $31.59 per share, erasing over $2.5 billion in market capitalization in a single day.

71.    On July 27, 2023, Walgreens issued a press release announcing the departure of defendant Kehoe, as Walgreens' Executive Vice President and Global CFO.  Shortly thereafter, on September 1, 2023, Walgreens issued another press release revealing the sudden departure of defendant Brewer as the Company's CEO and member of the Board.

72.    In response to the departures of two key Walgreens' executives, Deutsche Bank analysts noted: "[w]e cannot recall a time in coverage experience where we have seen both the CEO and the CFO depart a large-cap company in such a short span where there were not other issues at the company," and "departure of the two key executives comes at possibly the worst time."

73.    On this news, Walgreens' stock price dropped over 7%, or $1.88, on September 1, 2023, to close at $23.43 per share compared to the previous trading day's closing of $25.31 per share, erasing over $1.6 billion in market capitalization in a single day.

74.    On October 12, 2023, Walgreens held an earnings call with analysts and investors to discuss its fiscal fourth quarter and full year ended August 31, 2023.  During the call, defendant Driscoll offered assurances of progress on the Company's healthcare business.  In particular, defendant Driscoll stated:

> ***We are taking swift action to unlock the embedded profits at Village and already see the benefit of improved capital and expense management*** with the addition of our new CFO at Village, Rich Rubino.  VillageMD, Summit Health, and CityMD will be the most meaningful drivers of growth in fiscal 2024.
>
> It has taken us longer than anticipated to realize the cost synergies across the combined assets.  We also need to solve for a less efficient cost profile and excellence in execution.

75.    During the earnings call, in response to an analyst's question concerning Walgreens' closure of sixty clinics and its inability to drive volumes in those markets, defendant Driscoll downplayed the Company's ongoing challenges with growth and scaling VillageMD, stating:

> ***Every one of our clinics actually shows month-over-month growth, but we don't see the growth coming fast enough in certain markets.***  And so we're going to pivot there and be very focused on where we can drive the most profitable growth. We're growing through the rightsizing of our footprint and some of the changes in our relationships, but our strategy going forward will be really focusing on markets where we see that momentum and scale and at a level that we want to see to drive the profits and the margin expectations that we want.  ***So it's really more of a discipline around focusing on markets where we can go deep and continue to grow on a compounded serious way profitably.***

76.    On January 4, 2024, Walgreens issued a press release announcing its financial results for the fiscal first quarter of 2024 ended November 30, 2023.  The press release reported that the Company's adjusted EPS decreased by 43.1% to $0.66 on a year-over-year basis, reflecting a 43.7% decline on a constant currency basis.

77.    In response to Walgreens' disappointing earnings report, Jefferies analysts commented that, "our belief was that operations in their co-located VillageMD/Walgreens centers were the root cause of the significant earnings drag in WBA's US H/C Segment."  The analysts presented challenges with physician and patient recruitment at the centers as a potential issue affecting the segment's poor performance.

78.    On this news, Walgreens' stock price dropped over 5%, or $1.31, on January 4, 2024, to close at $24.26 per share compared to the previous trading day's closing of $25.57 per share, erasing over $1.1 billion in market capitalization in a single day.

79.    On January 8, 2024, during Walgreens' presentation at the JPMorgan Healthcare Conference, defendant Mahajan continued to provide assurances on VillageMD's performance and growth.  In particular, defendant Mahajan stated:

Village, we talked about as we came out in October.  And we said we want to really concentrate on accelerating the profitability within Village.  And that team has taken that task and is working through it.  We talked about we're going to exit roughly around 5 markets, 60 clinics.  I think we're halfway there at this point.  ***Their growth that we talked about, both on the risk-based book and fee-for-service panel in markets where they are dense, we continue to see that.  So yes, I think we're moving in the right direction as it relates to where the fiscal year is, and we'll continue to.***

80.    On March 28, 2024, Walgreens issued a press release announcing its financial results for the fiscal second quarter ended February 29, 2024.  In the press release, the Company once again presented only positive information regarding its U.S. Healthcare segment, highlighting that the Company was "encouraged by our first quarter of U.S. Healthcare positive adjusted EBITDA and continued topline growth[.]"

**Despite Ongoing Industry and Growth Challenges, Walgreens Misled the Public Concerning the Business Prospects for Its U.S. Retail Pharmacy Segment**

81.    During the October 12, 2023 earnings call, defendant Mahajan downplayed potential headwinds affecting the Company's U.S. Retail Pharmacy segment, while presenting positive claims for its growth and performance.  In particular, defendant Mahajan stated:

First, ***we anticipate script volume growth driven by overall market growth.***  On reimbursement, we have roughly 75% of the contract signed for calendar year '24.  ***We do expect reimbursement pressure to be less of a headwind in fiscal '24 than in fiscal '23.***

We're projecting approximately 5 million COVID vaccinations in 2024.  Quarter-to-date, we're well on track and have already administered over 3 million COVID vaccinations.  ***In retail, we expect margins to benefit from our category performance improvement program and a roughly 1 percentage point increase in own brand penetration.***

82.    During the call, in response to an analyst's question concerning expectations of prescriptions and reimbursements going down, defendant Gates downplayed the concerns and disclosed the Company's purported plans to derive profits from its U.S. Retail Pharmacy segment.  In particular, defendant Gates stated:

Obviously, we saw a weaker end of the fiscal year from market growth, specifically around cough, cold, flu, some of the respiratory, and some of the Medicaid redetermination, which shows some lower utilization from consumers.

So the primary driver of the market coming back in line with what the expectations are from IQVIA and others. And so that's really what we've seen as we started into the first quarter of the fiscal year and market is going to be a big underpinning to what we do. **But we continue to advance our adherence programs that are really driving incremental script growth, partnering with health plans and others to really drive better adherence.**

**And obviously, that does help on the script side.**

**You're also going to see some access initiatives, especially going into calendar year '24, which should be some tailwinds for us.** I think some changing dynamics in the marketplace or having individuals choose more open access and things that should give us access differently than what we've seen in the past. And the last one would be that we're really focused on potential for file buys and opportunities given some of the changes in the marketplace.

So I think **there's a bunch of drivers that really give us confidence that we have tailwinds behind us in the script [realm].**

83.    In response to an analyst's question about the Company's reported $1 billion cost-savings measure, defendant Mahajan revealed that the measure would be mostly tied to its U.S. Retail Pharmacy segment. In particular, defendant Mahajan stated:

So let me start with the cost savings. We're expecting at least $1 billion of cost savings. And I think the way you need to think about this is majority of this is going to be coming from our U.S. retail pharmacy business.

And three or four components, let me just walk through them real quick. Ginger talked about, we're looking at all costs related to headquarter support office, and we're going line by line. So that's one.

We are closing unprofitable locations, and that's going to be accretive in the year. We have optimized store hours in certain locations to match with where the local market already is.

84.    On January 4, 2024, Walgreens held an earnings call with analysts and investors to discuss its fiscal first quarter financial results. During the call, defendant Wentworth

acknowledged challenges in the retail environment, but continued to deliver optimistic assertions for Walgreens' U.S. Retail Pharmacy segment.  In particular, defendant Wentworth stated:

> As you are by now aware, WBA started fiscal 2024 with on-plan results **despite a weak retail environment in the U.S. First quarter adjusted EPS came in at $0.66, reflecting execution and cost discipline in U.S. Retail Pharmacy**, continued strong performance in International and progress with profitability initiatives in U.S. Healthcare.  **We are maintaining full year adjusted EPS guidance against a challenging backdrop.**  I must give credit here to the hard work and dedication of our teams.  We are navigating the accumulating consumer pressures from inflation and depleted savings and somewhat slower-than-anticipated market trends in pharmacy script volumes, including impacts from a weaker respiratory season and Medicaid redetermination.
>
> **Retail customers in the United States are under stress and making deliberate choices to seek value, evidenced in our own brands up 90 basis points in the quarter**, while demand for seasonal and discretionary categories remains weak.
>
> **At the same time, our teams executed well during the quarter on delivering pharmacy services, including vaccines, and maintaining our overall share of script volume in the U.S.** International was once again a bright spot in the quarter, building on last year's solid growth.  Upside was led by Boots U.K., with further share gains in retail, while both retail and pharmacy delivered gross profit improvement despite inflationary cost pressures.  Germany also achieved share gains.

85.    Defendant Wentworth praised the Company's rollout and overall strategy for its U.S. Retail Pharmacy segment and discussed the purported plans for improvement.  In particular, defendant Wentworth stated:

> We are enabling pharmacists to spend less time on tasks and more time on meaningful interactions and providing essential care, from health screenings to immunizations to diagnostic testing and treatment. Our network of micro fulfillment centers is helping to stabilize staffing and pharmacy hours, reduce workflow pain points and free up capacity to drive the outcomes that matter most to our patients and partners.
>
> You'll remember in October we mentioned a pause in the rollout to optimize productivity. **We are happy with our continued progress and the importance of these centers in our overall strategy.** We are also piloting virtual pharmacy to redefine connected care, further increase patient access, enhance workplace flexibility, and extend our pharmacist reach.

86.    During the call, defendant Mahajan acknowledged industry challenges but continued to downplay their impact.  He also presented an optimistic outlook on the Company's U.S. Retail Pharmacy segment's performance moving forward.  In particular, defendant Mahajan stated:

> We are maintaining our fiscal '24 adjusted EPS guidance.  **We expect certain incremental** tailwinds and headwinds in a challenging environment compared to our prior outlook.
>
> On the tailwinds, with strong execution to date, **we now expect pharmacy services to deliver ahead of our initial plan.  We also anticipate an improvement in our full year adjusted effective tax rate as a result of tax planning initiatives**, with a revised range of 15% to 17%, compared to the prior outlook of 19% to 20%.
>
> On the headwinds.  First, we expect the pullback in consumer spending and shifting behaviors will continue to impact our retail sales in the U.S. in the short term, while improving in the second half.  We now expect retail comp sales for fiscal '24 to **decline low single digits compared to the prior outlook of flat**.  Second, we expect approximately $125 million in reduced sale and leaseback gains versus our prior outlook.  As we explained in October, this is the last year of anticipated sale leaseback transactions.  Lastly, we also forecast **slightly lower overall market volume growth for prescriptions compared to our previous expectations**.

87.    On March 28, 2024, Walgreens held an earnings call, with analysts and investors, to discuss its fiscal second quarter financial results.  During the call, defendant Wentworth touted the Company's U.S. Retail Pharmacy segment's performance.  In particular, defendant Wentworth stated:

> We delivered another quarter of strong execution with outperformance in pharmacy services led by our vaccines portfolio.  While market growth was slower than originally anticipated, we maintained market share.  Our 11 micro fulfillment centers currently support 4,600 stores, which is over half our footprint.  Earlier this year, we talked about pausing the rollout of additional micro-fulfillment centers as we work to optimize the model that gives our pharmacists and technicians the ability to spend more time on customer-facing activities and less time on core dispensing.
>
> We're seeing benefits such as improved NPS scores, patient retention and adherence.

88.     Defendant Mahajan continued the call highlighting the U.S. Retail Pharmacy segment's performance, stating:

> Pharmacy comp sales increased 8.7%, mainly driven by brand inflation, volume growth and contribution from pharmacy services.  Comp scripts grew 2.9%, excluding immunizations, in line with the overall prescription market.  The ongoing impact of Medicaid redeterminations continued to negatively impact overall market growth.

> Pharmacy Services performed better than expectations, driven by our vaccines portfolio. Pharmacy adjusted gross profit was down slightly versus the prior year quarter with margin negatively impacted by brand mix impacts and reimbursement pressure net of procurement savings.

89.     The statements referenced above were each false and misleading when made because they failed to disclose that: (i) Walgreens' U.S. Retail Pharmacy segment was ill-equipped to address the ongoing challenges within the industry; (ii) Walgreens' optimistic claims of growth and stability for its U.S. Retail Pharmacy segment did not reflect its true state.

### THE TRUTH FULLY EMERGES

90.     On June 27, 2024, the truth fully emerged when Walgreens issued a press release announcing its financial results for the fiscal third quarter ended May 31, 2024.  The press release revealed a disappointing adjusted EPS of $0.63, marking a 36% decline compared to the same quarter last year.  Walgreens also revised its EPS guidance to a lower range of $2.80 to $2.95 per share, down from the previous range of $3.20 to $3.35 per share.  The Company attributed its unfavorable figures to "a challenging U.S. retail environment, and recent pharmacy industry trends."

91.     That same day, Walgreens hosted an earnings call with analysts and investors to discuss its financial results.  During the call, defendant Wentworth revealed the Company faced significant challenges with its U.S. Retail Pharmacy segment.  In particular, defendant Wentworth stated:

In U.S. Retail Pharmacy, we witnessed continued pressure on the U.S. consumer. Our customers have become increasingly selective and price-sensitive in their purchases. In response, we invested in targeted promotion and price decisions which have driven traffic and will generate improved customer loyalty, but they weigh on near-term profitability as we refine our approach. We remain relentlessly focused on enhancing the front of store and creating the right omnichannel experience for our customers while driving in-store efficiencies.

We also continue to face an incrementally challenging pharmacy industry. Recent trends, such as branded mix impacts and increased regulatory and reimbursement pressures, including fluctuations in NADAC pricing, have negatively impacted pricing dynamics. Additionally, the script market is growing but continues to trail below pre-pandemic growth levels.

These headwinds have affected our performance and are materially weighing on our ability to serve patients profitably. ***We are at a point where the current pharmacy model is not sustainable, and the challenges in our operating environment require we approach the market differently***.

92.     Defendant Mahajan continued the call disclosing additional details regarding the

Company's underperformance:

Comparable sales grew 3.5% year-on-year driven by brand inflation in pharmacy and prescription volume, partly offset by a decline in retail sales. AOI decreased 48% versus the prior year quarter. Approximately 70% of this decline relates to lower sale leaseback gains lapping reduced incentive accruals in the prior year and lower Cencora equity income. Challenging retail and pharmacy industry trends also negatively impacted AOI in the current period.

93.     During the call, defendant Wentworth also announced the Company's plans for

store closures as part of an effort to offset the lowered guidance. In particular, defendant

Wentworth stated:

To start, we are finalizing a multifactor store footprint optimization program which ***we expect will include the closure of a significant portion of these underperforming stores over the next 3 years***. Plans to finalize the number are in motion and we will update you in due course.

For the remaining portion of this cohort, we are taking action to return them to profitability and deliver an improved customer experience. ***We will contemplate additional closures if performance does not improve, which includes external factors such as reimbursement rates***.

94.    In response to an analyst's question concerning the future of the Company's U.S. Retail Pharmacy segment, non-defendant Mary Langowski ("Langowski"), Walgreens' Executive Vice President and President, U.S. Healthcare, admitted the Company was in need for a revision of its strategy.  In particular, Langowski stated:

> And put simply, the playbook is a bit dated and does not account for, nor does it adequately or fairly pay for, the role and value that we think the pharmacist is bringing and delivering services.
>
> We also don't think it accounts adequately for the complexity that we now face in the system.  And it certainly doesn't facilitate putting pharmacotherapy and behavioral interventions at the center of chronic disease management in this country.  We think that has to change, and so we're collaborating with our PBM partners across the industry to make those changes.

95.    In response to another analyst's question regarding the U.S. Retail Pharmacy segment's gross margin, defendant Mahajan revealed the Company underestimated the challenges within the industry, stating:

> So as you think about the gross margin on the retail pharmacy side, maybe a couple of things there. Let me start on the retail side. And what we've experienced in the third quarter, and we think the trend is going to continue in Q4, is **the environment didn't improve as we anticipated.** And as a result, we focused on investing in price and promotion.

96.    During the call, an analyst also inquired about the Company's plans to stabilize profit within the retail segment, as well as the prescription numbers not returning to pre-pandemic levels.  In response, defendant Wentworth revealed that the Company would have to undergo changes that will not be immediate.  In particular, defendant Wentworth stated:

> As you've heard us say or let me make sure you hear us say, we actually have a really strong level of conviction around the core business that we are remodeling here. **It will be a very different Walgreens in a lot of ways, a different experience.**
>
> But by the same token, we see a clear stabilization and actual growth path for that business. **It is going to take time.  We're not going to give you guidance, but it's quarters, not months.  It's not necessarily multiple years, but it is probably a**

*period of time that we will have to demonstrate to you, and frankly to our consumer, that we are going to deserve their preference.*

97.     Later that day, in an interview with the *Wall Street Journal*, defendant Wentworth announced that Walgreens was reducing its ownership stake in VillageMD and would no longer be the majority owner.  Regarding Walgreens' role as a majority investor in primary-care and specialty-care providers, defendant Wentworth stated, "is a strategy that we are no longer pursuing."

98.     On this news, Walgreens' stock plummeted over 22%, or $3.47 per share, on June 27, 2024, to close at $12.19 compared to the previous trading day's closing of $15.66 per share, erasing $2.9 billion in market capitalization in a single day.

## REPURCHASES APPROVED BY THE DIRECTOR DEFENDANTS

99.     Despite their knowledge, or reckless disregard for, the Company's issues concerning the business health and prospects of its U.S. Healthcare and U.S. Retail Pharmacy segments, the Director Defendants approved four substantial stock repurchases at artificially inflated prices.  While the price of the Company's common stock was inflated due to the false and misleading statements made by the Individual Defendants, the Director Defendants caused the Company to repurchase 11,448,228 shares of its own common stock for a total of $406,299,664.

100.    On January 6, 2022, Walgreens filed its Quarterly Report on Form 10-Q for the fiscal first quarter of 2022 ended November 30, 2021, with the SEC.  According to the Form 10-Q, Walgreens purchased 3,179,750 shares of its common stock for $153,868,102, at an average price of $48.39 per share.  However, the Company's stock was worth only $12.19 per share, the trading price at market close on June 27, 2024, after the truth had fully emerged.  Thus, Walgreens overpaid for repurchases of its own stock by over $115.1 million.

101.    On March 31, 2022, Walgreens filed its Quarterly Report on Form 10-Q for the fiscal second quarter of 2022 ended February 28, 2022, with the SEC.  According to the Form 10-Q, Walgreens purchased an additional 730,250 shares of its common stock for $33,116,837, at an average price of $45.35 per share, overpaying for the repurchases by more than $24.2 million.

102.    On January 5, 2023, Walgreens filed its Quarterly Report on Form 10-Q for the fiscal first quarter of 2023 ended November 30, 2022, with the SEC.  According to the Form 10-Q, Walgreens purchased 4,438,228 shares of its common stock for $149,967,724, at an average price of $33.79 per share, overpaying for the repurchases by more than $95.8 million.

103.    On January 4, 2024, Walgreens filed its Quarterly Report on Form 10-Q for the fiscal first quarter of 2024 ended November 30, 2023, with the SEC.  According to the Form 10-Q, Walgreens purchased 3,100,000 shares of its common stock for $69,347,000, at an average price of $22.37 per share.  Walgreens overpaid for the repurchases by more than $31.5 million.

104.    In sum, Walgreens overpaid $266.7 million for repurchases of its own common stock at artificially inflated prices.

## DAMAGES TO WALGREENS

105.    As a result of the Individual Defendants' improprieties, Walgreens disseminated improper, public statements concerning Walgreens' growth and business prospects.  These improper statements have devastated Walgreens' credibility as reflected by the Company's almost $31.6 billion, or 75%, market capitalization loss.

106.    Walgreens' performance issues also damaged its reputation within the business community and in the capital markets.  In addition to price, Walgreens' current and potential customers consider a company's ability to accurately value its business prospects and evaluate sales and growth potential.  Investors are also less likely to invest in companies that fail to disclose

material information in a timely manner.  Additionally, Walgreens' ability to raise equity capital or debt on favorable terms in the future is now impaired.  Furthermore, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

107.    Further, as a direct and proximate result of the Individual Defendants' actions, Walgreens has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)    costs incurred from investigating and defending Walgreens and certain officers and directors in the Securities Class Actions for violations of federal securities laws;

(b)    costs expended to correct Walgreens' inadequate internal controls over financial reporting;

(c)    excessive sums paid to repurchase Company common stock;

(d)    costs incurred from settlements or to satisfy adverse judgments; and

(e)    costs incurred from compensation and benefits paid to the defendants who have breached their duties to Walgreens.

## <u>DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS</u>

108.    Plaintiffs bring this action derivatively in the right and for the benefit of Walgreens to redress injuries suffered, and to be suffered, by Walgreens as a direct result of breaches of fiduciary duty and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Walgreens is named as a nominal defendant solely in a derivative capacity.

109.    Plaintiffs will adequately and fairly represent the interests of Walgreens in enforcing and prosecuting its rights.

110.    Plaintiffs were stockholders of Walgreens at the time of the wrongdoing complained of, have continuously been stockholders since that time, and are current Walgreens stockholders.

111.    The current Board of Walgreens consists of the following twelve individuals: defendants Wentworth, Pessina, Graham, Babiak, Bhandari, Hanson, Jarrett, Lederer, Polen, Schlichting, and Huffines, and non-defendant William H. Shrank.  Plaintiffs have not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because Defendants Wentworth, Pessina, Graham, Babiak, Bhandari, Hanson, Jarrett, Lederer, Polen, Schlichting, and Huffines Face a Substantial Likelihood of Liability for Their Misconduct**

112.    As alleged above, defendants Wentworth, Pessina, Graham, Babiak, Bhandari, Hanson, Jarrett, Lederer, Polen, Schlichting, and Huffines breached their fiduciary duties of loyalty by making improper statements in the Company's press releases and SEC filings regarding the business prospects and health of its U.S. Healthcare and U.S. Retail Pharmacy segments.

113.    Starting in 2021, Walgreens' fiduciaries have approved four stock repurchases while the Company's share prices were artificially inflated.  First, in November 2021, defendants Pessina, Graham, Babiak, Jarrett, Lederer, and Schlichting approved the repurchase of 3,179,750 shares of Walgreens common stock at a time when they knew, or with reckless indifference did not know, that Walgreens' stock price was inflated due to the hidden business problems, causing the Company to overpay by $115.1 million.  The following month, defendants Pessina, Graham, Babiak, Jarrett, Lederer, and Schlichting approved another stock repurchase of 730,250 shares of Walgreens common stock at a time when they knew, or with reckless indifference did not know, that Walgreens' stock price was inflated due to the hidden business problems, causing the Company

to overpay an additional $24.2 million. Thus, defendants Pessina, Graham, Babiak, Jarrett, Lederer, and Schlichting face a substantial likelihood of liability for their breach of fiduciary duties and violation of securities law.

114. In October 2022, defendants Pessina, Graham, Babiak, Bhandari, Jarrett, Lederer, and Schlichting approved a third stock repurchase of 4,438,228 shares of Walgreens common stock at a time when they knew, or with reckless indifference did not know, that Walgreens' stock price was inflated due to the hidden business problems, causing the Company to overpay by $95.8 million. Thus, defendants Pessina, Graham, Babiak, Bhandari, Jarrett, Lederer, and Schlichting face a substantial likelihood of liability for their breach of fiduciary duties and violation of securities laws.

115. Finally, in October 2023, defendants Pessina, Graham, Babiak, Bhandari, Hanson, Jarrett, Lederer, Polen, and Schlichting approved a fourth stock repurchase of 3,100,000 shares of Walgreens common stock at a time when they knew, or with reckless indifference did not know, that Walgreens' stock price was inflated due to the hidden business problems, causing the Company to overpay by $31.5 million. Thus, defendants Pessina, Graham, Babiak, Bhandari, Hanson, Jarrett, Lederer, Polen, and Schlichting face a substantial likelihood of liability for their breach of fiduciary duties and violation of securities laws.

## Additional Reasons Why Demand on Defendants Graham, Babiak, Jarrett, and Schlichting Is Futile

116. Defendants Graham, Babiak, Jarrett, and Schlichting, as members of the Audit Committee, reviewed and approved the improper statements and earnings guidance. The Audit Committee's Charter provides that it is responsible for overseeing, among other things, "the integrity of the Company's financial statements and its accounting and financial reporting process," and "the soundness of the Company's systems of internal accounting and financial controls." Thus,

the Audit Committee Defendants were responsible for knowingly or recklessly allowing the improper statements related to the Company's earnings guidance and financial and disclosure controls.  Moreover, the Audit Committee Defendants reviewed and approved the improper press releases made to the public.  Despite their knowledge or reckless disregard, the Audit Committee Defendants caused these improper statements.  Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty because they participated in the wrongdoing described herein.  Thus, defendants Graham, Babiak, Jarrett, and Schlichting face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

**Additional Reasons Why Demand on Defendant Wentworth Is Futile**

117.    Any suit by the current directors of Walgreens to remedy these wrongs would expose defendant Wentworth's liability for violations of the federal securities laws in the pending Securities Class Actions.  The Securities Class Actions allege violations of sections 10(b) and 20(a) of the Exchange Act.  If the Board elects for the Company to press forward with its right of action against defendant Wentworth in this action, then Walgreens' efforts would compromise its defense of the Securities Class Actions.

118.    The principal professional occupation of defendant Wentworth is his employment with Walgreens, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits as alleged above.  Accordingly, defendant Wentworth lacks independence from defendants Pessina, Graham, Babiak, Bhandari, Hanson, Jarrett, Lederer, Polen, Schlichting, and Huffines due to his interest in maintaining his executive position at Walgreens.  This lack of independence renders defendant Wentworth incapable of impartially considering a demand to commence and vigorously prosecute this action.

119.    Accordingly, defendant Wentworth is incapable of impartially considering a demand to commence and vigorously prosecute this action because he has an interest in maintaining his principal occupation and the substantial compensation he receives in connection with that occupation.  Demand is futile as to defendant Wentworth.

**Additional Reasons Why Demand on Defendant Pessina Is Futile**

120.    The principal professional occupation of defendant Pessina is his employment with Walgreens, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits as alleged above.   Accordingly, defendant Pessina lacks independence from defendants Wentworth, Graham, Babiak, Bhandari, Hanson, Jarrett, Lederer, Polen, Schlichting, and Huffines due to his interest in maintaining his executive position at Walgreens.   This lack of independence renders defendant Pessina incapable of impartially considering a demand to commence and vigorously prosecute this action.

121.    Accordingly, defendant Pessina is incapable of impartially considering a demand to commence and vigorously prosecute this action because he has an interest in maintaining his principal occupation and the substantial compensation he receives in connection with that occupation.  Demand is futile as to defendant Pessina.

## <u>COUNT I</u>

**Against the Individual Defendants for Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder**

122.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

123.    During the period of wrongdoing, the Individual Defendants disseminated or approved false or misleading statements about Walgreens, which they knew or recklessly disregarded were false or misleading and were intended to deceive, manipulate, or defraud.  Those

false or misleading statements and defendants' course of conduct artificially inflated the price of the Company's common stock.

124.    While the price of the Company's common stock was inflated due to the false and misleading statements made by the Individual Defendants, the Director Defendants caused the Company to repurchase shares of its own common stock at prices that were artificially inflated due to the defendants' false or misleading statements.  The Director Defendants engaged in a scheme to defraud Walgreens by causing the Company to repurchase $406,299,664 in shares of Walgreens stock at artificially inflated prices.

125.    The Individual Defendants violated section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Walgreens in connection with the Company's purchases of Walgreens' stock during the period of wrongdoing.

126.    The Individual Defendants, individually and collectively, directly and indirectly, by the use of means or instrumentalities of interstate commerce or of the mail: (i) engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon the Company; (ii) made various false or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; (iii) made the above statements intentionally or with a severely reckless disregard for the truth; and (iv) employed devices, and artifices to defraud in connection with the purchase and sale of Walgreens stock, which were intended to, and did: (a)

deceive Walgreens and its stockholders regarding, among other things, Walgreens' ongoing issues with its U.S. Healthcare and U.S. Retail Pharmacy segments; (b) artificially inflate and maintain the market price of Walgreens stock; and (c) cause Walgreens to purchase the Company's stock at artificially inflated prices and suffer losses when the true facts became known. Throughout the period of wrongdoing, defendants were in possession of material, nonpublic information regarding the above.

127.    The Individual Defendants were among the senior management and the directors of the Company, and were therefore directly responsible for, and are liable for, all improper statements made during the period of wrongdoing, as alleged above.

128.    As described above, the Individual Defendants acted with scienter throughout the period of wrongdoing, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness. The misstatements and omissions of material facts set forth in this Complaint were either known to the Individual Defendants or were so obvious that defendants should have been aware of them. Throughout the period of wrongdoing, the defendants also had a duty to disclose new information that came to their attention and rendered their prior statements to the market materially false or misleading.

129.    The Individual Defendants' false or misleading statements and omissions were made in connection with the repurchase of the Company's stock by the Company.

130.    As a result of the Individual Defendants' misconduct, Walgreens has and will suffer damages in that it paid artificially inflated prices for its own common stock and suffered losses when the previously undisclosed facts relating to the wrongdoing was disclosed.

131.    Walgreens would not have purchased these securities at the prices it paid, or at all, but for the artificial inflation in the Company's stock price caused by the Individual Defendants' false or misleading statements.

132.    As a direct and proximate result of the Individual Defendants' wrongful conduct, the Company suffered damages in connection with its purchases of Walgreens stock during the period of wrongdoing.  By reason of such conduct, defendants are liable to the Company pursuant to section 10(b) of the Exchange Act and SEC Rule 10b-5.

133.    Plaintiffs bring this claim within two years of their discovery of the facts constituting the violation and within five years of the violation.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duty

134.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

135.    The Individual Defendants owed and owe Walgreens fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Walgreens the highest obligation of care and loyalty.

136.    The Individual Defendants and each of them, violated and breached their fiduciary duties.

137.    The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the misconduct of such substantial magnitude and duration.  The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing Walgreens was releasing materially false and misleading information to the public.  Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

138.    The Director Defendants, as directors of the Company, owed Walgreens the highest duty of loyalty.  These defendants breached their duty of loyalty through their failure to: (i) provide truthful and accurate statements regarding the business prospects and growth for Walgreens' business segments; (ii) prevent the Company from engaging in several substantial repurchases of its own common stock at artificially inflated prices; and (iii) implement and maintain adequate internal controls over financial reporting.  Accordingly, these defendants breached their duty of loyalty to the Company.

139.    The Audit Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions.  The Audit Committee Defendants completely and utterly failed in their duty of oversight and in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

140.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Walgreens has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

141.    Plaintiffs, on behalf of Walgreens, have no adequate remedy at law.

<u>**COUNT III**</u>

**Against the Individual Defendants for Unjust Enrichment**

142.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

143.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Walgreens.  The Individual Defendants were

unjustly enriched by the compensation and director remuneration they received while breaching fiduciary duties owed to Walgreens.

144.    Plaintiffs, as stockholders and representatives of Walgreens, seek restitution from these defendants, and each of them, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

145.    Plaintiffs, on behalf of Walgreens, have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs, on behalf of Walgreens, demand judgment as follows:

A.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' violation of securities law, breach of fiduciary duties, and unjust enrichment;

B.    Directing Walgreens to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Walgreens and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.    a proposal to strengthen the Board's supervision of operations;

2.    a proposal to strengthen Walgreens' oversight of stock repurchases;

3.    a proposal to strengthen the Company's controls over financial reporting;

4.    a proposal to strengthen Walgreens' oversight of its disclosure procedures;

5.      a proposal to develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

6.      a provision to permit the stockholders of Walgreens to nominate at least three candidates for election to the Board;

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiffs on behalf of Walgreens have an effective remedy;

D.      Awarding to Walgreens restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by defendants;

E.      Awarding to plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury.

Dated: December 4, 2024                    **COOCH AND TAYLOR, P.A.**

_/s/ Blake A. Bennett_
 Blake A. Bennett (DE Bar #5133)
The Brandywine Building
1000 N. West St., Suite 1500
Wilmington, DE 19801
Telephone: (302) 984-3800
Facsimile: (302) 984-3939
E-mail: bbennett@coochtaylor.com

**ROBBINS LLP**
Brian J. Robbins
Stephen J. Oddo
5060 Shoreham Place, Suite 300
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

E-mail: brobbins@robbinsllp.com
            soddo@robbinsllp.com

*Attorneys for Plaintiffs*